IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| John Medaglia III, ) | C/A No.: 1:24-533-MGL-SVH |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | REPORT AND |
| Allendale Police Dept. and Chief ) | RECOMMENDATION |
| Wiggins, also known as Lawrence ) | |
| Wiggins, ) | |
| ) | |
| Defendants. ) | |
| ) | |

John Medaglia III ("Plaintiff"), proceeding pro se, alleges that on November 7, 2023, he was wrongfully arrested while exercising his Constitutional rights at a post office in Allendale, South Carolina. Plaintiff sues the Allendale Police Department and its Chief Lawrence Wiggins ("Wiggins") (collectively "Defendants"). Defendants seek dismissal of Plaintiff's claims.

Plaintiff filed this case on February 1, 2024, asserting that his First and Fourth Amendment rights have been violated, referencing a kidnapping claim under South Carolina law pursuant to S.C. Code Ann. § 16-3-910, as well as a claim for intentional infliction of emotional distress. [ECF No. 1]. This matter is before the court on Defendants' motion for summary judgment. [ECF No. 22]. Pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975),

the court advised Plaintiff of the dismissal procedures and the possible consequences if he failed to respond adequately to Defendants' motion. [ECF No. 24]. Having been briefed [ECF No. 26, 27], the motion is ripe for disposition.

Pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Civ. Rule 73.02(B)(2)(d) (D.S.C.), this matter has been referred to the undersigned for all pretrial proceedings. After carefully considering the record, the undersigned recommends the district judge grant Defendants' motion for summary judgment.

I.  Factual and Procedural Background

Plaintiff alleges in his unverified complaint in full as follows:

> On 11-07-23, I (plaintiff) was in the public area of the post office at 315 Augusta Hwy filming my transaction when the defendant subsequently arrested me for expressing my first amendment rights and took my ID after refusing to identify myself, then he took me outside against my will to arrest and book me.
>
> I ask the court to grant me $400,000 for all punitive damages for the alleged violations as well as intentional infliction of emotional distress. I would also like a written official apology from the defendant regarding said violations.

[ECF No. 1 at 5 (errors in original, minor edits made)].[1]

---

[1] In this Circuit, verified complaints filed by pro se plaintiffs can be considered as affidavits when the allegations contained therein are based on personal knowledge. *See, e.g., Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991). However, Plaintiff's complaint in this case is not verified nor has

In response, Defendants have submitted the following undisputed evidence: On November 7, 2023, Plaintiff visited the post office in Allendale, South Carolina, to record a video to be placed on his YouTube channel. [ECF No. 22-1 at 0:13].[2] Plaintiff testified the video contains all "pertinent" interactions relative to that visit. [ECF No. 22-3 32:8–33:3].

Plaintiff's video begins with him walking into the post office, waiting near the boxes, and then filming a closeup of Poster 7, which states the following:

> Photographs for news purposes may be taken in entrances, lobbies, foyers, corridors, or auditoriums when used for public meetings except where prohibited by official signs or Security Force personnel or other authorized personnel or federal court order or rule. Other photographs may be taken only with permission of the local Postmaster or installation head.

[ECF No. 22-1 at 0:27–1:11, *see also* ECF No. 22-2].

Although not featured in the closeup by Plaintiff, Poster 7 also contains a specific restriction on disturbances:

---

Plaintiff submitted any evidence in response to Defendants' motion for summary judgment. [*See* ECF Nos. 1, 26].

[2] Defendants have submitted evidence that Plaintiff holds himself as "First Amendment Protection Agency" or "FAPA," and maintains a YouTube channel under that same name. [ECF No. 22-1 at 13:28]. Medaglia "travel[s] the country doing first amendment audits on municipalities and public buildings." *Id.* at 13:28. Medaglia derives income from taking videos in public places and quasi-public places such as post offices and then posting them on his YouTube channel. [ECF No. 22-3 at 20:1–22:13]. Plaintiff disputes Defendants' assertion that he is not "press," but this dispute is immaterial to the resolution of the instant motion. [*See* ECF No. 26 at 1].

> Disturbances
>
> Disorderly conduct, or conduct that creates loud and unusual noise, or which impedes entrance to or departure from Post Offices™ or otherwise obstructs the usual use of entrances, foyers, corridors, offices, elevators, stairways, and parking lots, or which otherwise tends to impede or disturb the public or employees in the performance of their duties, or which otherwise impedes or disturbs the general public in transacting business or obtaining the services provided on Postal Service property, is prohibited.

[ECF No. 22-2].[3]

After viewing Poster 7, Plaintiff opens the entry doors to the post office, interacts with Sherri, who identifies herself as the officer in charge ("OIC") that day. [ECF No. 22-1 at 1:14–3:05]. At this point, there are no others in the room, and Plaintiff proceeds to purchase one stamp and briefly discuss Poster 7 with Sherri. *See id.*

After completing his transaction, Plaintiff does not exit the post office, but instead stands in a corner facing the entry doors. *Id.* at 3:06. Red typeface appears on the screen: "I was about to head out after thinking no one was

---

[3] Similarly, 39 C.F.R. § 232.1(e), concerning disturbances on postal property, provides as follows:
> Disorderly conduct, or conduct which creates loud and unusual noise, or which impedes ingress to or egress from post offices, or otherwise obstructs the usual use of entrances, foyers, corridors, offices, elevators, stairways, and parking lots, or which otherwise tends to impede or disturb the public employees in the performance of their duties, or which otherwise impedes or disturbs the general public in transacting business or obtaining the services provided on property, is prohibited.

4

gonna say a word but I knew things were gonna go downhill when this clown showed up . . ." *Id.*

A black male ("the Customer") walks through the entry doors, and Plaintiff immediately engages him. *Id.* at 3:13–3:16. Upon seeing Plaintiff pointing a phone camera at him, the Customer tells Plaintiff that he needs permission to take pictures of him, and Plaintiff responds, "No, I don't." *Id.* at 3:17–3:24. The Customer then turns his back on Plaintiff, approaches the counter, and asks Sherri, "What's wrong with this crazy guy in here?" *Id.* at 3:24–3:26. Sherri responds that she does not know, and they have a brief exchange during which the Customer remarks that the "crazy guy" cannot be taking pictures of him, and Sherri indicates she needs "to call somebody" about Plaintiff. *Id.* at 3:27–3:58. The Customer then stands at the counter while he waits for Sherri to go in the back. *Id.* at 3:58–4:26.

The Customer remarks to another customer, "I don't know what he's doing," and he and Plaintiff have an exchange about what he "can and cannot do." *Id.* at 4:26–4:57. There is silence for a few seconds, until Plaintiff reengages the Customer: "Walk in here, cause a disturbance and call me a crazy guy." *Id.* at 5:05–5:07. The Customer turns around and asks, "What disturbance I got?" and there is another heated exchange. *Id.* at 5:08–5:38. After a few seconds of silence, Plaintiff remarks out loud, "Oh boy, Sherri, this was going a lot better in the beginning." *Id.* at 5:44–5:48.

5

At this point, there is another heated exchange:

Customer: You gotta let people know what you're doing.
Plaintiff: No, I don't.
Customer: Ok. I guarantee you do. In this post office.
Plaintiff: No, I guarantee you I don't.
Customer: Ok.
Plaintiff: If you'd like, you can stick around for a free education, maybe the cops are coming, I don't know.
Customer: I don't need an education from you.
Plaintiff: Oh, it's not gonna be from me. It'll be from the cops that come.
Customer: I don't need no education from you.
Plaintiff: Maybe, uh, maybe you didn't hear me. I said it will be the—
Customer: Maybe you didn't hear me, what I say.
Plaintiff: Yeah? What did you say?
Customer: Why are you talking to me?
Plaintiff: [snickers]
Customer: Yeah, you the smart one.
Plaintiff: Yeah, I know. And you seem to be the dumb one.
Customer: Call me dumb again. Call me dumb again. Call me dumb again.

*Id.* at 5:48–6:32. During this exchange, the Customer moves close to Plaintiff's camera. He then turns his back on Plaintiff and returns to the counter. *Id.* at 6:36–6:38. Plaintiff continues loudly chewing gum, which can be heard at various times throughout the video. *See id.*

With the Customer's back to Plaintiff, there is another period of brief silence during which Sherri can be heard making a call about a "situation in the lobby." *Id.* at 6:38–7:08. Plaintiff then remarks, ostensibly to his viewers, "Well, this started off a lot better guys. We were about to have a very nice, cordial conversation with Sherri, but, uh, now this has turned to a different

6

situation. And, as you guys know, these things change quick, so . . ." *Id.* at 7:08–7:27.

Another customer then enters the post office and exchanges pleasantries with the Customer. *Id.* at 7:33–7:41. Plaintiff tells her, "Be careful, I wouldn't take your phone out, this guy's gonna get in your face." *Id.* at 7:48–8:00. The Customer tells him, "Keep being smart. And you're gonna get what's coming to you. I guarantee you that." *Id.* at 8:00–8:10. Plaintiff then remarks out loud that Sherri has called 911 and then chuckles. *Id.* at 8:30–8:34. Plaintiff says, "Good, maybe this guy will learn something." *Id.* at 8:37–8:41.

Sherri returns and the Customer continues his transaction. *Id.* at 9:26–9:40. Red typeface appears on the screen: "Here comes the uninformed feelings enforcement . . . ANOTHER CHIEF TOO!!! It seems as though SC has an amazing way to choose/train their chiefs lmfaooo." *Id.* at 9:40. Wiggins walks into the post office. *Id.* at 10:00. Sherri tells Wiggins that Plaintiff has been recording and the Customer did not want to be recorded. *Id.* at 10:00–10:17. A dialogue ensues, in which Plaintiff continues to taunt the Customer. *Id.* at 10:17–10:40. Wiggins explains, "If you want him gone, you can ask him to leave," at which point Sherri, as OIC, asks Plaintiff to leave. *Id.* at 10:40–11:36.

7

Wiggins tells Plaintiff that he can leave or be arrested for trespassing. *Id.* at 11:45–11:58. Plaintiff chooses to stay, argues with Wiggins, repeatedly telling Wiggins to call his supervisor, and is subsequently arrested. *Id.* at 11:58–12:45. Red typeface appears on the screen, "Although this chief treated me with complete disrespect and total indifference to my basic god given rights . . . I was treated with the utmost repsect [sic] back at the station!!! Shoutout to my man Big Smokey!!" *Id.* at 12:45.

II. Discussion

    A.    Standard on Summary Judgment

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse

party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248. Further, while the federal court is charged with liberally construing a complaint filed by a pro se litigant to allow the development of a potentially meritorious case, *see, e.g., Cruz v. Beto*, 405 U.S. 319 (1972), the requirement of liberal construction does not mean that the court can ignore a clear failure in the pleadings to allege facts that set forth a federal claim, nor can the court assume the existence of a genuine issue of material fact when none exists. *Weller v. Dep't of Soc. Servs.*, 901 F.2d 387 (4th Cir. 1990).

B.  Analysis

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. The Supreme Court has identified

three categories of police-citizen encounters and as summarized by the Fourth Circuit:

> Each category represents differing degrees of restraint and, accordingly, requires differing levels of justification . . . . First, "consensual" encounters, the least intrusive type of police-citizen interaction, do not constitute seizures and, therefore, do not implicate Fourth Amendment protections. *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). Second, brief investigative detentions—commonly referred to as "Terry stops"—require reasonable, articulable suspicion of criminal activity. [*Terry v. Ohio*, 392 U.S. 1, 21 (1968)]. Finally, arrests, the most intrusive type of police-citizen encounter, must be supported by probable cause. *Devenpeck v. Alford*, 543 U.S. 146, 152, 125 S.Ct. 588, 160 L.Ed.2d 537 (2006).

*Santos v. Frederick Cty. Bd. of Comm'rs*, 725 F.3d 451, 460 (4th Cir. 2013).

Regarding the third category, "a warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). "The Fourth Amendment is not violated by an arrest based on probable cause." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Probable cause exists if the "facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person . . . in the circumstances shown, [to conclude] that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). "The validity of the arrest does not depend on whether the suspect actually committed a crime; the mere fact that the suspect is later

10

acquitted of the offense for which he is arrested is irrelevant to the validity of the arrest." *Id.* at 36.

"In assessing the existence of probable cause, courts examine the totality of the circumstances known to the officer at the time of the arrest." *Taylor v. Waters*, 81 F.3d 429, 434 (4th Cir. 1996). "Probable cause requires more than 'bare suspicion,' but requires less than evidence necessary to convict." *Porterfield v. Lott*, 156 F.3d 563, 569 (4th Cir. 1998) (citation omitted). Reasonable law officers need not "resolve every doubt about a suspect's guilt before probable cause is established." *Torchinsky v. Siwinsky*, 942 F.2d 257, 264 (4th Cir. 1991) (citation omitted).

Additionally, under the qualified immunity defense, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity ensures that "[o]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992). Whether an officer is entitled to qualified immunity is a question of law for the court and, when there are no relevant disputed material facts, a court should rule on the qualified immunity issue at the summary judgment stage. *Willingham v. Crooke*, 412 F.3d 553, 558

(4th Cir. 2005) ("Ordinarily, the question of qualified immunity should be decided at the summary judgment stage.").

To resolve a qualified immunity defense, the court must (1) determine whether the facts alleged, taken in the light most favorable to the plaintiff, show that the defendants' conduct violated a constitutional right, and (2) determine whether the right was clearly established at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Courts may address the two prongs of the qualified immunity analysis in whichever order is appropriate in light of the circumstances of the particular case at hand. *Id.*

Here, even taking evidence in light most favorable to Plaintiff, Wiggins had probable cause to arrest Plaintiff for the violation of trespassing and therefore did not violate Plaintiff's Fourth Amendment rights. The evidence is undisputed that the post office had a posted policy against disturbances and that a reasonable officer would perceive that Plaintiff repeatedly attempted to create a disturbance.[4] Plaintiff has failed to introduce any

---

[4] Defendants argue as follows:
> Medaglia's actions were not only taunting, they were incendiary. According to the last census, 71.9% of the Allendale County population is African American. https://www.census.gov. Medaglia, a white male in his 20s, walked into a post office in a predominately African-American community and told the Customer that he was dumb, needed an education, and that he would receive this education by "the cops that come." It is this

12

evidence that an objectively reasonable officer lacked probable cause to arrest him based on the undisputed facts of this case. *See, e.g., Brown v. Gilmore*, 278 F.3d 362, 368 (4th Cir. 2002) ("To prove an absence of probable cause, Brown must allege a set of facts which made it unjustifiable for a reasonable officer to conclude that she was violating the disorderly conduct ordinance.").

Although not binding precedent, the court finds instructive the analysis found in *Gibson v. Hadzic*, C/A No. 4:22-00163-SPM, 2023 WL 6214856, at *1 (E.D. Mo. Sept. 25, 2023). In *Gibson* case, a man who identified himself as a "citizen journalist" went into a post office, began taking video footage, was asked to leave, and was arrested. *Id.* The court, in granting the defendants motion to dismiss, held in part as follows:

> To prevail on either his First or Fourth Amendment claims, Plaintiff must plead and prove that Officers Hadzic and Holmes had no probable cause to arrest him. *See Nieves v. Bartlett*, 139 S. Ct. 1715, 1724–25 (2019) (plaintiff bringing a First Amendment claim based on arrest must "plead and prove the absence of probable cause for the arrest . . . Absent such a showing, a retaliatory arrest claim fails."); *Quraishi v. St.*

---

> conduct that rose to disorderly conduct specifically prohibited by Poster 7 and federal regulations. In other words, Medaglia knowingly acted in a manner designed to alarm and disturb a customer and provoke a breach of the peace.

[ECF No. 22 at 8]. Plaintiff disagrees, arguing "[t]he defendants' characterization of my conversation as potentially criminal or offensive due to racial dynamics is baseless and inappropriate. My comments during the interaction were within the bounds of respectful discourse and did not constitute 'fighting words' or any form of unlawful speech." [ECF No. 26 at 2]. As stated above, from the point of view of a reasonable officer, the record shows that Plaintiff was attempting to create a disturbance.

> *Charles Cty.*, 986 F.3d 831, 835 (8th Cir. 2021) ("To prevail on either of their First or Fourth Amendment claims, the [plaintiffs] must show that [the officer] had no probable cause") (citing *McCabe v. Parker*, 608 F.3d 1068, 1075 (8th Cir. 2010) (lack of probable cause is a necessary element for First and Fourth Amendment claims arising out of an arrest)). Defendants argue Plaintiff cannot meet the no-probable-cause pleading requirement because, based on the facts alleged in the complaint, the officers had probable cause to believe Plaintiff was committing trespass . . . .
>
> Focusing on the plausible facts alleged in the complaint, Officers Hadzic and Holmes went to the post office in response to a 9-1-1 call from the post office supervisor, who reported that Plaintiff was being "unreasonable" and was refusing to stop filming and refusing to leave. By Plaintiff's own account in the complaint, after the officers arrived at the post office, they confirmed with the supervisor that she wanted Plaintiff to leave. Despite being told by both the supervisor and the officers to leave the post office, Plaintiff refused, claiming he had a right to be on public property. Plaintiff's complaint even alleges Officer Holmes warned him that if he did not leave the post office, he would go to jail for trespassing.
>
> The foregoing facts show that, under the totality of the circumstances known to the officers, the officers had probable cause to believe Plaintiff was engaged in the crime of trespass. Thus, Plaintiff's claims for First and Fourth Amendment violations based on his arrest fail as a matter of law . . . .

*Id.* at *4–5.

Here, too, and for the same reasons, both Plaintiff's First and Fourth Amendment claims fail. *See, e.g., Nieves*, 139 S. Ct. at 1724–25 (plaintiff bringing a First Amendment claim based on arrest must "plead and prove the absence of probable cause for the arrest . . . Absent such a showing, a retaliatory arrest claim fails."); *Hulbert v. Pope*, 70 F.4th 726, 738 (4th Cir.

14

2023) ("Because Pope reasonably could have believed that his orders to Jeff and Kevin Hulbert were lawful, he is also entitled to qualified immunity on their First Amendment retaliatory-arrest and Fourth Amendment unreasonable-seizure claims. A First Amendment retaliatory-arrest claim fails as a matter of law if there was probable cause for the arrest. So does a Fourth Amendment unreasonable-seizure claim.") (citations omitted)).[5]

Here, where the evidence taken in light most favorable to Plaintiff does not indicate a constitutional violation occurred, Defendants are entitled to qualified immunity and dismissal of Plaintiff's First and Fourth Amendment claims.

Turning to his remaining claims, to the extent that Plaintiff is attempting to bring a private cause of action for kidnapping under South Carolina criminal statutes, he has failed to offer evidence or argument that he may do so. *See* S.C. Code Ann. § 16-3-910. "Generally, there is no private cause of action under criminal statutes." *Heard v. Fed. Bureau of*

---

[5] Plaintiff states, without explanation, that "[t]he Defendant witnessed similar actions from another individual, yet chose not to intervene or take similar action, further demonstrative discriminatory intent." [ECF No. 26 at 3]. To the extent that Plaintiff is arguing the narrow *Nieves* exception is applicable here, he has failed to offer argument or evidence in support and the undisputed record undermines this argument. *See, e.g., Nazario v. Gutierrez*, 103 F.4th 213, 237 n.11 (4th Cir. 2024) (citing *Nieves* and stating that "in circumstances where the 'officers have probable cause to make arrests, but typically exercise their discretion not to do so,' the existence of probable cause will not vitiate a retaliatory arrest claim").

*Investigation*, C/A No. 9:18-1743-HMH-BM, 2018 WL 4926459, at *2 (D.S.C. Sept. 12, 2018), report and recommendation adopted, 2018 WL 4915825 (D.S.C. Oct. 10, 2018); *see also Doe v. Broderick*, 225 F.3d 440, 447–48 (4th Cir. 2000) ("The Supreme Court historically has been loath to infer a private right of action from a 'bare criminal statute' because criminal statutes are usually couched in terms that afford protection to the general public instead of a discrete, well-defined group.") (quoting *Cort v. Ash*, 422 U.S. 66, 80 (1975)); *see also, e.g., Dennison v. Hayes*, C/A No. 2:21-02877-RMG-MHC, 2022 WL 18135244, at *5 (D.S.C. Dec. 2, 2022) ("To extent that Plaintiff is attempting to bring a private cause of actions for alleged perjury (§ 16-9-10), forgery (§ 16-13-10), and/or kidnapping (§ 16-3-910) under South Carolina criminal statutes, he has alleged no facts to indicate that he may bring a private cause of action."), report and recommendation adopted, C/A No. 2:21-2877-RMG, 2023 WL 112755 (D.S.C. Jan. 5, 2023).

Finally, Plaintiff's claim for intentional infliction of emotional distress is barred by the South Carolina Tort Claims Act, S.C. Code Ann. § 15-78-70 *et seq.* ("SCTCA"). The SCTCA is "the exclusive remedy for any tort committed by an employee of a governmental entity" acting within the scope of his employment. S.C. Code Ann. § 15-78-70(a). "The State, an agency, a political subdivision, and a governmental entity are liable for their torts in the same manner and to the same extent as a private individual under like

circumstances, subject to the limitations upon liability and damages, and exemptions from liability and damages, contained" within the SCTCA. S.C. Code Ann. § 15-78-40.

The SCTCA additionally provides a "governmental entity is not liable for the loss resulting from . . . employee conduct outside the scope of his official duties or which constitutes actual fraud, actual malice, intent to harm, or a crime involving moral turpitude." S.C. Code Ann. § 15-78-60(17); see also id. at § 15-78-70(b). "[U]nder the SCTCA, for a given tort, either the governmental entity or the employee is liable but not both." Newkirk v. Enzor, 240 F. Supp. 3d 426, 436 (D.S.C. 2017).

The SCTCA does not allow a plaintiff to recover against a governmental entity for intentional infliction of emotional distress. S.C. Code Ann. § 15-78-60(17); § 15-78-30(f) (defining "loss" to mean "bodily injury, disease, death, or damage to tangible property, including lost wages and economic loss to the person who suffered the injury, disease, or death, pain and suffering, mental anguish, and any other element of actual damages recoverable in actions for negligence, but [ ] not [ ] the intentional infliction of emotional harm."); Smith v. City of Charleston, 2007 WL 9735801, at * 5 (D.S.C. July 24, 2007) ("Recovery from governmental entities for intentional torts and intentional infliction of emotional distress is specifically barred by the Tort Claims Act.").

Accordingly, the undersigned recommends the district judge grant Defendants' motion for summary judgment.[6]

III. Conclusion and Recommendation

For the foregoing reasons, the undersigned recommends the district judge grant Defendants' motion for summary judgment. [ECF No. 22].

IT IS SO RECOMMENDED.

August 23, 2024                                    Shiva V. Hodges
Columbia, South Carolina                  United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**

---

[6] Given the recommendation above, the court need not address Defendants' additional arguments that Allendale Police Department is entitled to summary dismissal because it is not a specific "person" subject to suit under 42 U.S.C. § 1983, that claims asserted against Wiggins in his official capacity should be dismissed pursuant to the Eleventh Amendment, that Plaintiff is not entitled to punitive damages, or that Defendants are entitled to immunity under the SCTCA.

18

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation. 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).